ALBERT J. WHEELER, Individually and as Executor of MARY J. WHEELER, Deceased, et al., Appellants, *v.* THE PHENIX INSURANCE COMPANY OF BROOKLYN, Respondent.

Insurance (fire) — liability of insurer for loss resulting from explosion preceded and caused by fire.

When a policy of insurance against fire upon a grain elevator provides that the company should not be liable for loss by explosion of any kind unless fire ensues, and in that event for the damage by fire only, a fire preceding and causing the explosion is not embraced in the exception from the provision which insures against all direct loss or damage by fire, and if a negligent or hostile fire exists within the insured premises and an explosion results therefrom under such circumstances as to constitute the fire the proximate cause of the loss and the explosion merely incidental, the company becomes liable upon its policy for the loss resulting therefrom.

*Wheeler* v. *Phenix Ins. Co.*, 136 App. Div. 909, reversed.

(Argued October 23, 1911; decided November 3, 1911.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered December 16, 1909, affirming a judgment in favor of defendant entered upon a dismissal of the complaint by the court at a Trial Term.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Charles Diebold, Jr.*, for appellants.   The explosion clause does not relieve an insurance company from liability for loss directly caused by an accidental fire in the insured premises.   (Richards on Ins. Law [3d ed.], 370; Kerr on Ins. 370; 2 May on Ins. [4th ed.] § 416a; 3 Joyce on Ins. § 2772; Elliott on Ins. 212; *Washburn* v. *A. Ins. Co.*, 29 Fed. Cas. 308; *Washburn* v. *U. F. Ins. Co.*, 29 Fed. Cas. 329; *Washburn* v. *M. V. Ins. Co.*, 2 Fed. Rep. 633; *La Force* v. *W. F. Ins. Co.*, 43 Mo. App. 518; *Cohn* v. *Nat. Ins. Co.*, 96 Mo. App. 315; *T. A. F. Ins. Co.* v. *Dorsey*, 56 Md. 70; *Mitchell* v. *P. Ins. Co.*, 183 U. S. 42; *G. A. Ins. Co.* v. *Hyman*, 42 Col. 156.)

*Edgar J. Nathan* for respondent.   The policy exempts the insurer from liability for loss caused directly or indirectly by explosion of any kind.   (*Beakes* v. *P. Ins. Co.*, 143 N. Y. 402; *Hoffman* v. *King*, 160 N. Y. 618; *Hustace* v. *P. Ins. Co.*, 175 N. Y. 302; *St. John* v. *A. M. F. & M. Ins. Co.*, 11 N. Y. 516; *Briggs* v. *N. A. Ins. Co.*, 53 N. Y. 446; *Miller* v. *L. & L. Ins. Co.*, 41 Ill. App. 395; *G. F. Ins. Co.* v. *Roost*, 55 Ohio St. 581; *Heuer* v. *N. W. Nat. Ins. Co.*, 144 Ill. 393; *Stanley* v. *Western Ins. Co.*, L. R. [3 Exch.] 71.)   The complaint was properly dismissed for failure of proof.   (*Clark* v. *F. M. F. Ins. Co.*, 111 Wis. 65; *W. A. Co.* v. *Mohlman Co.*, 83 Fed. Rep. 811; 1 Clement on Ins. 126; *Lamb* v. *Union R. Co.*, 195 N. Y. 260; *Milbaur* v. *Richard*, 188 N. Y. 453; *Pinder* v. *B. H. R. R. Co.*, 173 N. Y. 519; *Cassidy* v. *Uhlmann*, 170 N. Y. 505; *Fealey* v. *Bull*, 163 N. Y. 397; *Babcock* v. *F. R. R. Co.*, 140 N. Y. 308; *Pauley* v. *S. G. & L. Co.*, 131 N. Y. 90; *Schoepflin* v. *Coffey*, 162 N. Y. 12; *Ruppert* v. *B. H. R. R. Co.*, 154 N. Y. 90; *Hudson* v. *R., etc., R. R. Co.*, 145 N. Y. 408; *People* v. *Harris*, 136 N. Y. 429; *Clarke* v. *Koeppel*, 119 App. Div. 458; *Gunther* v. *L. & L. & G. Ins. Co.*, 134 U. S. 110.)

HAIGHT, J.   This action was brought to recover the amount of a policy of insurance issued by the defendant

to the plaintiffs, insuring them against direct loss or damage by fire to the Ontario elevator situated on the east side of the Evans ship canal in the city of Buffalo.

The complaint alleges that the property was wholly destroyed by fire on the 30th day of October, 1904, and that the plaintiffs sustained a loss of $103,000, with an aggregate insurance of $94,750, and demands judgment for the amount of the policy. The answer admits the issuance of the policy and denies the other material allegations of the complaint, and alleges as a defense: *First*, that the damage was caused by an explosion for which the defendant, under its policy, is not liable; and, *second*, that the elevator fell, not as a result of fire.

The Ontario elevator was a wooden structure built in the year 1889, the main building being one hundred and nine feet front and eighty-three feet deep, having two marine towers, one on the north and the other on the south end thereof. The bins in the building were constructed of hemlock plank laid flatwise to the height of fifty-two feet, and on top thereof there was a double floor, over which there was a vast open space of irregular shape because of the gables in the roof, about seventy-eight feet in height, in which was located the machinery by which the grain was hoisted to the machinery floor and then distributed by means of spouts to the different bins below. In the northeast corner of the machinery floor was a matched board closet, planed on one side and called a locker or cupboard, in which the workmen kept their clothes, supplies for the machinery, lamps and a quantity of beef suet. The building was used for the elevating and storage of grain that came from vessels down the lakes. On the arrival of a vessel loaded with grain the leg of the marine tower containing an endless belt on which were fastened buckets at regular intervals would be lowered into the hold of the vessel and then by causing the belt to revolve the buckets would fill with grain and elevate the same to the tower above where it

would be deposited in large hoppers which would convey it to the machinery floor where it would be distributed by means of spouts as before stated. The engines and boiler which furnished the power by which the elevator was operated were located in a brick building near by but in nowise connected with the elevator building. In withdrawing grain from the elevator for the purpose of loading cars or canal boats or other means of transportation the grain is run through a spout in the bottom of each bin into pits or conveyors on the ground floor and is then taken by an elevator similar to the marine leg, where it is conveyed to the machinery floor near the peak of the roof where it is weighed and then conveyed to its destination by means of spouts, the same as when it was elevated originally from the vessel. In elevating the grain from a vessel for storage, or in elevating it from the bins to be withdrawn from storage, a great amount of dust is created and brought into the machinery room above the top of the bins.

On Friday night preceding the destruction of the elevator the steamer *Penobscot* arrived with a cargo of over one hundred thousand bushels of barley, which was elevated in the manner already disclosed, which contained great quantities of dust which was deposited on the floor and disseminated into the atmosphere of the machinery room. The work ceased about two o'clock Saturday morning, but during Saturday the elevator was in operation transferring grain from different bins and in loading cars. After the work ceased on Saturday night the watchman made his rounds regularly until four o'clock in the morning, and when he left all the windows of the machinery floor were closed and there was then no light or fire in the building. A few minutes after eleven o'clock in the forenoon of Sunday a great explosion occurred, in which the building was wrecked, and at that time it contained 297,000 bushels of grain.

The theory of the plaintiffs is to the effect that sponta-

neous combustion occurred among the material contained in the locker, so called, which created a fire that burned over and charred the boards out of which the closet was constructed, and that this fire ignited the dust that was contained in the machinery room and caused the explosion which wrecked the building.

Upon the trial the court directed a nonsuit at the close of the plaintiff's evidence upon the ground that the defendant was not liable under its policy even though the explosion was caused by fire, under the authority of *Hustace* v. *Phenix Ins. Co. of Brooklyn* (175 N. Y. 292) and *Briggs* v. *North American & M. Ins. Co.* (53 N. Y. 446). He, however, held that the evidence tending to show that the explosion was caused by fire was sufficient to make that a question of fact for the jury.

The policy of insurance upon which this action is based undertook to insure the plaintiffs "against all direct loss or damage by fire except as hereinafter provided." Under the provision thereafter provided as the exception is the following: "This company shall not be liable for loss caused directly or indirectly by invasion, insurrection, riot, civil war or commotion, or military or usurped power, or by order of any civil authority; or by theft; or by neglect of the insured to use all reasonable means to save and preserve the property at and after a fire or when the property is endangered by fire in neighboring premises; or (*unless fire ensues,* and, in that event, *for the damage by fire only*) *by explosion of any kind.*" Webster defines "ensues" as meaning "to follow or come afterwards; to follow as a consequence or in chronological succession, to result." The provision, therefore, embraced in the exception "unless fire ensues" should be read as meaning "unless fire follows or comes after or as a consequence of the explosion." This being the meaning of the provision it is apparent that a fire, which precedes and causes the explosion, is not embraced in the exception contained in the policy from the provision

which insures against all direct loss or damage by fire. Nor do we think that the words "by explosion of any kind" were intended to refer to the agency which produced the explosion but have reference to the different kinds of material that explode, such as powder, dynamite, gas, dust, etc. Had the legislature, in adopting the standard form of policy, intended to have included explosions caused by fire with explosions from which fire ensues among the loses excepted from the provisions of the policy it doubtless would have done so in express terms. That such was not its intention we think is clearly evident from the fact that they were careful to limit the exception to those explosions from which a fire ensues. This form of fire insurance policy and the construction which we have given to it is not new. It has frequently been considered by the courts and text writers upon the subject, who have quite uniformly reached the conclusion that when a negligent or hostile fire exists within the insured premises and an explosion results therefrom under such circumstances as to constitute the fire the proximate cause of the loss and the explosion merely incidental the company becomes liable upon its policy for the loss resulting therefrom.

In the case of *Washburn* v. *Miami Valley Insurance Co.* (2 Fed. Rep. 633) it was held that where a policy of insurance against loss by fire contains the condition that the insurance company shall not be liable for any loss or damage occasioned by explosion of any kind unless fire ensues, and then for the loss or damage by fire only, and when a fire originates in the insured premises which produces an explosion by which that property is destroyed such destruction is a loss by fire within the meaning of the policy. Justice SWAYNE of the Supreme Court of the United States, before whom the case was tried, in his opinion, says: "Explosives are named only in connection with fires which they have produced. There is nothing said about them in connection with fires which have pro-

duced them. The policies on that subject are wholly silent. Is not this somewhat remarkable, if the construction contended for by the companies be correct? In that case would not the language of the context have naturally been that the company will not be liable for explosions, and will not be liable for fires which produce them, or fires which they have produced? The first may define the liability of the company, and the sentence I have just read is certainly important. Would not the policies have read 'that they will not be liable for explosions caused by fires, or for fires caused by explosions?' I repeat, and it is a feature of great significance in the case, as it seems to me, that where explosions are produced by fires — accidental fires — the policy is wholly silent." He then proceeds with an elaborate discussion of the question, reaching the conclusion that the explosion was a part of the fire and as such was covered by the general language of the insurance policy. (See, also, Richards on Insurance Law [3d ed.], p. 370; Kerr on Insurance, 370; 2 May on Insurance [4th ed.], § 416a; 3 Joyce on Insurance, § 2772; Elliott on Insurance, 212; *Washburn* v. *Artisan Ins. Co.* and *Washburn* v. *Penn. Ins. Co.*, 29 Fed. Cases, 308; *La Force* v. *Williamsburg F. Ins. Co.*, 43 Mo. App. 518; *Transatlantic F. Ins. Co.* v. *Dorsey*, 56 Md. 70; *Ger. Am. Ins. Co.* v. *Hyman*, 42 Col. 156, and *Mitchell* v. *Potomac Ins. Co.*, 183 U. S. 42.)

We do not regard the case of *Briggs* v. *North American and Mercantile Insurance Co.* (53 N. Y. 446) or the case of *Hustace* v. *Phenix Ins. Co. of Brooklyn* (175 N. Y. 292) as in conflict with the views hereinabove expressed. In the *Briggs* case the explosion was caused by the vapors from rectifying spirits coming in contact with the flame of a lamp. It was held that the lamp was not a fire within the meaning of the policy. It was not a hostile fire which made the explosion the incident, but itself became the incident. But in that case Judge PECKHAM, in delivering the opinion of the court, was careful to distin-

guish it by stating "where, however, the explosion is the incident and the fire the principal, a different question would be presented. Had the building been on fire, and in the course of a general conflagration there had been an explosion of a boiler, which injured some machinery that the fire was rapidly consuming, different views and considerations might well obtain" (p. 449), thus recognizing the principle to which we have already alluded.

In the *Hustace* case a large building at the corner of Warren and Greenwich streets, in the city of New York, occupied by dealers in drugs and chemicals, was on fire. The fire had raged for half an hour and then a terrific explosion took place caused by the igniting of the chemicals stored therein, wrecking several buildings, among which was that of the plaintiff's, which was located across a street or alley some fifty-seven feet distant therefrom. The plaintiff's building fell by reason of the concussion caused from the explosion. No hostile fire was in progress upon the plaintiff's premises and no explosion occurred therein. It was held in this court that the loss sustained by the plaintiffs was not a "direct loss or damage by fire" within the meaning of the policy, but the fire was only a remote and indirect cause of the concussion which caused the plaintiff's building to fall. There is nothing in that case which is in conflict with the views that we have expressed in this case. It may be true that in the opinion discussing the various cases upon the subject there may be some expression that has misled the trial court in this case, but the learned chief judge in concluding his opinion in that case was careful to limit the decision to the peculiar facts presented in that case. We, consequently, conclude that the trial court erred in granting a nonsuit upon this branch of the case.

It is now contended on behalf of the respondent that, notwithstanding the ruling of the trial court, the evidence is insufficient to warrant a submission of the question to the jury as to whether a fire existed in the building

which caused the explosion. In the first place it appears from the evidence that there were a number of pieces of matched boards, planed on one side and rough on the other, which were found after the explosion, burned and charred to such an extent as to indicate that a blaze must have existed. These boards were found embedded in the grain bin underneath the closet or locker and were positively identified, by the carpenter who constructed the closet and another witness, to be part of the boards which constituted the closet and which were not burned or charred before the day of the explosion. It further appears by the testimony of a large number of witnesses who were in the vicinity at the time of the explosion that their attention was attracted to the building by a loud noise likened by many to the boom of a cannon and that immediately thereafter the roof of the building appeared to raise and split in two, then go off toward Norton street, emitting therefrom a great volume of smoke followed by dust and that this was followed a few seconds afterwards by a crash, a breaking of timbers and the falling of the building. Of course the witnesses speaking upon this subject, occupying different positions in the vicinity of the elevator, did not all see the same things alike; some described the scene as the puffing of smoke and dust together, while others were positive that the puff of smoke preceded the dust; one stating that his attention was attracted by a dull, heavy report more like a cannon shot off in a covered inclosure; that he turned and saw the roof of the elevator as it was going off toward Norton street in the air, and that there was a cloud of black smoke with a reddish tinge, full of sparks all through under the roof, which were flashing and going out, and that several seconds afterwards there was a crash and a breaking and crunching like timbers or woodwork breaking, and that a dense gray cloud of dust came across the street, blotting everything out of sight. There was also evidence tending to show that on Saturday pre-

ceding the explosion there was a great quantity of dust in the machinery room suspended in the air, and that dust in a closed room without a current of air circulating through it would remain suspended for many hours. It also appeared from the testimony of experts, one of whom was a professor of chemistry in the George Washington University, who had formerly been a professor of chemistry in Harvard, and who had made a special study, and had written upon the subject of grain dust and had made experiments with reference thereto, that barley dust was not explosive but was combustible when mixed with air, and if ignited the combustion would proceed with such velocity as to produce an explosion; that the dust of barley was composed of organic matter from the barley.

Upon this review it is not our province to determine the credibility of witnesses or to carefully weigh the conflicting evidence produced. We are only called upon to determine whether there is evidence sufficient to require the submission of the question of fact to the jury. If it be true that barley dust is not explosive but is combustible only, then it would be difficult to account for the explosion which wrecked the building and the smoke and dust that followed, unless there was fire in the building which ignited the dust. The testimony, therefore, of the plaintiffs' witnesses with reference to the quantity of dust suspended in the closed room on the machinery floor, with the explosion and the smoke and dust and sparks arising therefrom, together with the fact that charred and burned boards were subsequently found out of which the closet or cupboard was constructed, together with the testimony of the expert, in our judgment was sufficient to carry that question of fact to the jury.

The judgment of the Appellate Division and that of the trial court should be reversed and a new trial ordered, with costs to abide the event.

CULLEN, Ch. J., GRAY, VANN, WERNER, CHASE and COLLIN, J., concur.

Judgment reversed, etc.