[Civ. No. 2229. Fourth Appellate District.—March 13, 1939.]

ROMA WINE COMPANY, INC., Respondent, v. HARD-WARE MUTUAL FIRE INSURANCE COMPANY OF MINNESOTA (a Corporation) et al., Appellants.

Long & Levit and Galen McKnight for Appellants.

Gumpert & Mazzera, C. H. Hogan and Conley, Conley & Conley for Respondent.

BARNARD, P. J.—This is an action on two fire insurance policies issued by the defendants, one covering a building used by the plaintiff as a winery and the other covering certain wines stored therein. After a verdict in favor of the defendants the court entered an order granting the plaintiff a new trial, the order reciting that the new trial was granted on the insufficiency of the evidence. From this order the defendants have appealed.

The rules of law applicable upon such an appeal are well settled. The question presented is whether or not the trial court abused its discretion in granting the motion for a new trial, and it cannot be held that such abuse appears where there is a substantial conflict in the evidence or where there is any substantial evidence which would support a judgment in favor of the moving party. (*Roberts* v. *Southern Pac. Co.*, 54 Cal. App. 315 [201 Pac. 958]; *Taylor* v. *Rodriquez*, 10 Cal. App. (2d) 608 [52 Pac. (2d) 494]; *Peri* v. *Culley*, 119 Cal. App. 117 [6 Pac. (2d) 86]; *Prout* v. *Perkins*, 21 Cal. App. (2d) 343 [69 Pac. (2d) 194]; *Wendling Lumber Co.* v. *Glenwood Co.*, 153 Cal. 411 [95 Pac. 1029].) In the last-named case, the court said:

"To justify any interference of this court with an order granting a new trial on the ground of insufficiency of evidence, the case must be such as to compel us to hold that a verdict in favor of the moving party would not have found sufficient legal support in the evidence given on the trial. If the case be one where a verdict in favor of such moving party would have had such support the judge of the trial court is invested with absolute discretion in the matter, and, as has been heretofore said by this court, it was his duty to grant a new trial if he is not satisfied with the verdict."

In this winery was one room, known as the sherry room, which contained seven large tanks. There was but one door to this room and tank 49, with which we are here concerned, was the one farthest from this door. This tank, having a capacity of 25,000 gallons, was made of redwood staves and had an air-tight top except for an opening about 2½ inches in diameter, the purpose of which was to release the pressure by permitting air to enter the tank as the wine was drawn out. On the side of this tank and about 4 feet from the floor

of the room was an opening about 10 inches by 16 inches, which we will refer to as a manhole.

On the day here in question, one Henry Miller, an employee of the respondent, was directed to clean the sediment or "lees" out of tank 49, the wine having been pumped from that tank the night before. There was about five or six inches of lees on the bottom of the tank, the temperature of which was around 130 or 135 degrees while the temperature of the sherry room was about 110 to 115 degrees. The cleaning was done by opening this manhole and inserting a long-handled "squeegee", a kind of rake, and raking the lees, which was in the form of a thick liquid, toward a bunghole on the floor of the tank, just below the manhole. Miller stuck his head through the manhole and saw no sign of fire within the tank. One Oscar Schamphan, who was helping Miller, also looked into the tank and saw no fire or flame. Miller reached in and hung an electric light, attached to an ordinary light cord, inside the tank in order that he might see to do the work. He proceeded to rake the lees forward toward the manhole, sending Schamphan for another squeegee with a longer handle. After he had been working for two or three minutes he saw fire within the tank. The fire came out of the manhole and ignited his clothes, and he ran to the door and out of the room. He was very severely burned on the whole front of his body from the waist up, his lungs were seared, and he was confined to a hospital for seven weeks.

It is assumed by all parties to this action that the fire or explosion, whichever it was, occurred because a spark was introduced into a mixture of alcohol vapor and air which was present in this tank, and which was also present in the sherry room, and that this spark came from the breaking of this electric light globe, although Miller did not remember having broken it. The sole controversy here is as to whether an explosion first occurred or whether there was a pre-existing fire. As stated by both parties,

"There is but one primary issue or question of fact to be determined. And that question of fact is whether the combustion or oxidation which existed in sherry tank 49 from the time Mr. Miller first saw and observed it there until it reached out through the open manhole, igniting the fumes in the sherry room, which in turn resulted in the explosion with a consequent wrecking of the building was itself an ordinary

fire as that term is generally understood, or whether it was a preliminary explosion which in turn resulted in the greater explosion which caused the damage in question.''

In *New Hampshire Fire Ins. Co.* v. *Rupard,* 187 Ky. 671 [220 S. W. 538], it is said:

''The appellants insist that all the evidence is to the effect that the inflammable gas in the room was ignited by the flames of the match, and that its burning therein for a short space of time before the noise and effect of the explosion occurred was only a part of the explosion, and hence that the burning of the floor, fixtures, papers, boxes, and clothing before the culmination of the explosion was a fire subsequent, and not antecedent, to the explosion. However well this theory may accord with scientific principles as applied to such an occurrence, it is not in accord with the commonly accepted opinion of what constitutes an explosion. Ordinary people other than scientists would hold that the explosion occurred when the sudden expansion took place which wrecked the building, accompanied by a more or less loud report. In *Mitchell* v. *Potomac Ins. Co., supra* (183 U. S. 42 [22 Sup. Ct. 22, 46 L. Ed. 74]), the word 'explosion' as used in an insurance policy was defined to be what ordinary men, not scientists, understood an explosion to be, and this view of what the term in a policy of insurance is intended to mean is concurred in generally.''

In *Mitchell* v. *Potomac Ins. Co.,* 183 U. S. 42 [22 Sup. Ct. 22, 46 L. Ed. 74], the court said:

'' 'When the word ''explosion'' was used in the policy, the company as ordinary men, . . . and the party insured an ordinary man, are presumed to have understood the word ''explosion'' in its ordinary and popular sense. Not what some scientific man would define to be an explosion, but what the ordinary man would understand to be meant by that word.' ''

We will now turn to the evidence, with the above-mentioned rules in mind. Miller testified that as he was working there he ''suddenly saw fire'' in tank 49; that he ''stood there and looked at it kind of stunned, to see a fire in such a place''; that the fire appeared to be crawling over the lees and started up along the walls of the tank, and then the whole tank filled up and the flames came out at him; that it appeared to him that the walls were burning; that he heard no explosion or

sharp report; that the flames made a roaring noise like "a furnace going"; that the flames came out of the manhole toward him; that when he noticed the fire coming toward him he shut his eyes and started to run from the room; that his clothes were burning and that he felt the fire from his waist up and on his face; that he was not thrown against anything by any explosion; and that approximately a minute and a half or two minutes elapsed from the time he first saw the flame in the tank until he got out of the room. Schamphan testified that when he returned from the errand on which he had been sent "I walked back in the sherry room and I seen fire"; that the fire was in the vicinity of the manhole of tank 49; that "all I could see was all aflame"; that these flames made a loud roaring noise, "a similar sound to a furnace, when it is running at full blast"; that he heard no explosion; that when he saw the flames "I stood there dumbfounded"; that a certain amount of time elapsed but he did not know whether it was a second or a minute; that he stood there and watched the fire; that he then started back for the door; that when he reached the door it came to his mind that Miller was still in there and "I turned around and came back in the room"; that he did not know the distance he came back; that "By that time the flames seemed to roll right across in front of me and I thought it would be a good time to leave"; that as he stood within the sherry room and saw and heard the roar of the flames in the vicinity of tank 49 he did not hear or see any bricks or mortar or timber fall; that nothing fell while he had the room within his view; that the entrance way or door to the room was clear of everything when he left the room; and that the walls and roof of the sherry room were then intact as far as he could see.

The superintendent of the winery testified that he was in his office some fifty feet from the sherry room when he suddenly heard a roaring noise and thought a boiler was on fire; that for a moment he was stunned and listened to it wondering what it could have been; that immediately thereafter he heard someone shout "Fire!"; that he started out of the building going from his office into the general office, around the counter and into an alley way and then turning toward the alley way leading toward the sherry room; that there he met Miller whose clothes were burning; that he pulled off Miller's shirt and he and another man tried to extinguish the

fire in his clothes; that he heard no noise of an explosion until just before he reached Miller, at which time he heard one; and that the roar of the fire and flames continued from the time he first heard it until he heard the explosion or report. Another witness testified that he was on the roof of the office when he heard a roaring noise which "I thought might have been a big fire"; that when he heard this noise he hesitated a minute and first intended to slide down a pipe to the ground but on second thought he climbed over a fire wall and went to a ladder on the opposite side of the office portion of the building; that while proceeding to the ladder he heard no explosion and heard nothing except the roaring sound which he had described; that he looked toward the roof of the sherry room and saw nothing unusual until he reached the ladder; that he then turned around and looked toward the sherry room at which time he "heard a loud report and the roof of the sherry room came up, it lifted up on one side and the flames shot out there about, oh, I'd say 15 or 20 feet; and bricks, part of the roof, one thing and another, was falling in all directions. I got out of there"; that as he crossed the roof toward the ladder he stopped and looked back three or four times "and the noise was getting more intense every minute"; that as he reached the ladder and turned around "I seen the roof—and I heard the report"; and that he would say it was two or two and one-half minutes from the time he first heard the roar until he heard the report. Other witnesses testified that after the fire or explosion the inside of tank 49 was "black throughout"; that the lower portion was burned and charred more than the upper portion; that on the lower portion from one-sixteenth of an inch to an eighth of an inch of the wood was charred and burned; that this tank and its top were intact except that two or three of the planks in the top were broken where a timber from the roof had fallen upon it; and that there was a pile of debris in the doorway leading from the sherry room.

Three expert witnesses testified. One, testifying for the appellants, expressed the opinion that the first thing that must have occurred was an explosion in tank 49 when a spark came in contact with the right combination of alcoholic vapor and air, that this explosion forced flames out of the manhole causing a second explosion in the sherry room; that no fire preceded these explosions, and giving his reasons at length. Two

other experts, testifying for the respondent, expressed the opinion that no explosion occurred within tank 49; that a fire existed there; that burning gas given off by the lees at that temperature came out through the manhole, igniting similar gas which was in the sherry room; that this burned until such a time as the burning gas reached the point or place where the mixture of gas and air existed in the right combination to cause an explosion, which then occurred; and that there was a preexisting fire which burned for an appreciable time and which itself caused the explosion which later occurred, and giving at length their reasons for this opinion.

The appellants argue, in effect, that the testimony of their expert was more worthy of belief than that given by the other experts. Relying upon the testimony of their expert witness they argue that alcohol vapor is an explosive gas; that tank 49 contained this vapor in its highest explosive form; that "the *explosion* of alcohol vapor is merely *combustion* or the propagation of a flame through the mixture"; and that the first thing that occurred in tank 49, when a spark appeared, must have been an explosion. While in a technical sense an explosion may be merely a form of combustion, to the ordinary man an explosion means something different from a mere burning. This expert had no knowledge as to the exact conditions prevailing in tank 49, and his opinions were necessarily based on various assumptions. Giving his opinion the weight to which it was entitled as evidence, the fact remains that there was other evidence, both expert and direct, which conflicted therewith.

While there was no conflict in the testimony of what may be called the eye-witnesses, the appellants point to portions thereof other than those we have referred to, which are relied upon as modifying their testimony and justifying inferences favorable to the appellants. For example, while Miller testified that approximately a minute and a half or two minutes elapsed from the time he first saw the flame in tank 49 until he reached a point of safety he later stated that he could not be sure of the time and that the elapsed time might have been closer to ten or fifteen seconds. Again, although Miller testified that immediately after he saw the fire he was not thrown against anything by an explosion he was asked on cross-examination whether, having felt "a pretty heavy burn. about that time", it was not possible that feeling the burn

might have taken his mind off any blow there might have been back of the flame and, in reply, he said: "I really don't know." At best, the matters relied upon by the appellants amount to nothing more than conflicts in the evidence.

The question whether an ordinary fire, as that term is generally understood, here existed or whether a preliminary explosion occurred in tank 49, which in turn resulted in a greater explosion in the room itself, was one of fact. Tank 49 was left intact and a considerable interval elapsed before any explosion was heard and before any of the usual results of an explosion were observed. Notwithstanding the attack made upon its credibility the court was justified in believing the testimony of the two experts who testified for the respondent. The attacks upon the testimony of what may be called the eye-witnesses go to the weight thereof and their evidence was in itself sufficient to justify the inference or finding that a fire preceded any explosion and burned for a considerable time before an explosion occurred. Conceding that there was evidence which would have supported a contrary conclusion there was, in our opinion, substantial evidence upon the point here presented which would have supported a judgment in favor of the respondent. It follows that the granting of a new trial was within the sound discretion of the court and that its action may not be here disturbed.

The order appealed from is affirmed.

Marks, J., and Griffin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on April 5, 1939, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 11, 1939.