# Richmond

MERRIMACK MUTUAL FIRE INSURANCE COMPANY v. MRS. GIUSEPPA LANASA.

March 6, 1961.

Record No. 5185.

Present, Eggleston, C. J., and Spratley, Buchanan, Whittle, Snead and I'Anson, JJ.

The opinion states the case.

*Edward A. Marks, Jr.* (*Sands & Marks*, on brief), for the plaintiff in error.

*Robert H. Patterson, Jr.* (*William A. Forrest, Jr.; McGuire, Eggleston, Bocock & Woods*, on brief), for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

Mrs. Giuseppa Lanasa, sometimes hereinafter referred to as the insured, owned a one-story building on Franklin Street, in Richmond, Virginia. The building was insured against loss by fire by Merrimack Mutual Fire Insurance Company, hereinafter referred to as the insurer. The policy of insurance contained a provision exempting the insurer from liability for loss occurring, "As a result of explosion or riot, unless fire ensue, and in that event for loss by fire only." On June 27, 1957, while the policy was in force, the building was demolished by fire and explosion. Payment for loss was refused by the insurer and Mrs. Lanasa brought this action. The insurer denied liability, asserting that the loss was occasioned by an explosion, and was, therefore, not covered under the terms of its policy. Trial by jury resulted in a verdict for the insured, which was approved by the trial court. Upon petition of insurer we granted a writ of error.

The material evidence, stated in the light most favorable to the insured, in view of the jury's verdict, is as follows:

The building of Mrs. Lanasa was occupied and used as a wholesale fruit storage house by her son, Vincent Lanasa. It contained six rooms, each 18 feet square, which were used alternately for refrigeration and ripening purposes. Four rooms were on one side of the building and two on the other, with a hallway between. The floors were of concrete and the sidewalls were of cork, with wood ceilings about 7 feet above the floor. About 3 feet above the wood ceiling was another ceiling enclosing a space into which gases created by the ripening processes of the fruit could escape through an opening between the wood ceiling and the sidewalls. In each room there was a gas jet on the back wall, the flame from which furnished the heat for ripening the fruit. Each room had an entrance door and two smaller ventilation doors, one on each side of the entrance door, similar to refrigerator doors. A switch controlling the electric lights

in each room was located in the hallway immediately to the right of the door as one enters.

On the night of June 26, 1957, Vincent Lanasa placed a load of bananas in Room No. 2, the second room from the front of the building. He hung the bananas in bunches, measuring two and one-half feet in diameter, to hooks on joists in the ceiling. He turned the gas jet about half-way on and lighted the gas to start the ripening process, and left the building. He returned the next morning at 5:00 a.m., and began an inspection of the several rooms. Detecting the odor of gas in Room 2, he turned the electric light on in that room from the switch in the hallway, entered the room, and finding the gas jet not burning, turned it off. He left a crack, 2 or 3 inches, in the door, opened the refrigerator doors, extinguished the electric light, and continued his inspection tour of the remaining rooms. An hour later, after performing other duties, Lanasa returned to Room 2 to determine the temperature from a thermometer hanging from the ceiling in the middle of the room. Before entering, he cut the light on by means of the electric switch in the hallway, opened the door, and walked about 8 feet to the center of the room. He then looked up through the thickly strung banana bunches, saw a fire above them; and said it looked, "Red. Just like a regular fire, any other ordinary fire. Like you burn wood, or anything." He said as "everything started to burn," he tried to get out of the room, and when he got near the door, with the fire all about him, "the explosion blew me and knocked me out." The fire practically enveloped him, burning his hands, face, hair and clothes.

Lanasa later regained consciousness and got out of the building. He was carried to a hospital, where he remained for a period of ten weeks with severe burns on his body. After being discharged, he underwent further treatment for nine weeks for third degree burns, which, according to his physician, resulted from fire and not explosion.

Jerry Burke, a mechanical engineer, who qualified as an expert witness on the phenomena of fire and explosion, testified in response to a hypothetical question based on the testimony of Lanasa, that in his opinion the fire described by Lanasa was a gaseous fire, and that such a fire is substantially the same as "a fire of wood, or coal, or any other combustible material;" that it could have resulted in the destruction of the building; that the fire was not an explosion and would not have usually resulted in an explosion unless the air pressure was increased, and could not expand; that such a fire may exist and be

extinguished by an explosion without leaving evidence of fire; and that this occurs "right regularly." He said that there was no difference between the fire that Lanasa described as seen by him before the explosion and the one hereinafter described which followed the explosion. He further said that the explosion which resulted from the first fire was because it was contained; but that there was no explosion from the second fire because it was not contained.

Both Burke and a witness for the insurer expressed the opinion that the "flicking" or "switching" on of an electric switch provides a possible activating agency of ignition, that is, when it furnishes a spark near a collection of gas mixed with a certain amount of air and the mixture becomes subject to pressure by confinement of space.

John F. Finnegan, Jr., Battalion Chief, Richmond Bureau of Fire, said that he responded to a call to the Lanasa Building on June 27, 1957, at 6:30 a. m. Three fire engine companies went to the scene in his charge. Upon arrival, he found the building in "shambles," and he thought it was "obvious that there had been an explosion." He ordered the gas cut off and proceeded to make an inspection of the building; but found it impossible for him or his men to go more than fifteen or twenty feet inside the structure without endangering their lives. He thus restricted his examination to that portion of the building in front known as the office. One wall had been pushed out, another blown down, and the roof blown upward. Not finding any fire, Finnegan released two of his fire units and they returned to their firehouse. He kept one on standby for an emergency. About fifty minutes after he released the two units, and during the continuation of his inspection, a police officer reported to him "a small amount of smoke coming out of the top of the building." Finnegan looked, saw the smoke, ordered ladders and ascended to the upper front level of the building. He then saw that, "approximately, on the second floor in the back toward the back of the building in a group of containers such as orange crates, banana crates and so forth, there was a flame visible about the size of this chair. (the witness chair.)" He said that as he attempted to extinguish the fire, "A flash, screen of fire, came over the top of our heads," and the whole upper portion of the building was on fire in a matter of four or five minutes. He summoned additional fire units, and the fire was eventually brought under control, after it had consumed much of the debris left in the building and the upper timbers. He found portions of the

concrete floor broken, "where pieces of debris had been knocked down from above;" but saw no visible signs of fire damage to the floor itself. No explosion resulted from the fire he saw in the upper portion of the building.

The testimony of Chief Finnegan, James A. Rives and W. C. Chewning, witnesses, and the photographs introduced in evidence conclusively show that the building was totally destroyed.

The trial court prepared and gave to the jury four instructions. The insurer objected only to the first three. The fourth related to the weight of evidence.

Instruction No. 1 correctly defined the words "fire" and "explosion."

Instruction No. 2 embodied all of the elements of the respective theories of the parties, the principles of law applicable to the evidence, and was in accordance with the weight of authority. *Harbridge* v. *Mutual Fire Ins. Co.*, 151 Pa. Super. 278, 30 A. 2d 360, 363. Its last sentence is very favorable to the insurer.

The third instruction properly told the jury that if they believed that the insured had proven by a preponderance of the evidence that a hostile fire preceded the explosion, she was entitled to recover the combined loss from explosion and fire; but that if she had not carried that burden of proof, then she was entitled to recover the amount of the damages shown to have been caused by the fire which followed the explosion.

Insurer asserts here that "The meat of all the assignments of error is that there is no evidence in the case that any fire as contemplated in the policy pre-existed and caused the explosion." Its argument is based upon the theory that "the undisputed evidence establishes conclusively that the flicking of the electric switch created a spark igniting the gas and causing the explosion."

The case has been well briefed and ably argued.

In arriving at a determination of the principal issue, we are governed by well established principles or rules.

In *Pearcey* v. *St. Paul Fire Ins. Co.*, 163 Va. 928, 931, 177 S. E. 843, we said that where "the explosion is caused by a preceding hostile fire during its progress in the insured premises, the insurer is liable both for the loss caused by the fire and also that caused by the explosion, since fire is the proximate cause of the whole loss and the explosion is a mere incident." 45 C. J. S., Insurance, § 818, page 867; *Bilsky* v. *Sun Ins. Office, Limited, of London, England*, 231 Mo. App. 1072, 84 S. W. 2d 171.

We also said in the above case that it is incumbent on the insured "to show a hostile fire which in its natural course would have destroyed the insured property." (163 Va. at page 931)

The rule as stated in 29A Am. Jur., Insurance, § 1295, page 419, and approved in *Allied American Mutual Fire Ins. Co.* v. *Wesco Paving Co.*, 35 Tenn. App. 154, 243 S. W. 2d 141, is as follows:

"If the combustion and explosion are inseparably connected, as where a combustible substance in the process of combustion produces explosions also, and fire is the agent throughout, and there is a loss both by fire and by explosion, it is held that the whole damage is covered by a policy insuring against loss by fire."

In *Wheeler* v. *Phenix Ins. Co.*, 203 N. Y. 283, 96 N. E. 452, 454, this is said:

"It has frequently been considered by the courts and textwriters upon the subject who have quite uniformally reached the conclusion that when a negligent or hostile fire exists within the insured premises, and an explosion results therefrom under such circumstances as to constitute the fire the proximate cause of the loss * * *, the company becomes liable upon its policy for the loss resulting therefrom."

A fire, as contemplated under the provisions of the policy here involved may be one of gases, as well as one of wood, coal, or other solid substance. *Allied American Mutual Fire Ins. Co.* v. *Wesco Paving Co., supra; Roma Wine Co.* v. *Hardware Mutual Fire Ins. Co.*, 31 Cal. App. 2d 455, 88 P. 2d 260; *Commercial Standard Ins. Co.*, v. *Feaster*, 259 F. 2d 210, 214.

The distinction between a "hostile" fire and a "friendly" fire is clearly set out in *Frings* v. *Farm Bureau Mutual Fire Ins. Co.*, 99 Ohio App. 293, 133 N. E. 2d 407, 410, as follows:

"If the fire burns in a place where it is intended to burn, although damages may have resulted where none were intended, the fire is a friendly fire, and the insurer is not liable for damages flowing therefrom. A friendly fire refers to one which remains confined within the place intended, and refers to a fire in a furnace, stove, or other usual place. A hostile fire, on the other hand, means one not confined to the place intended, or one not intentionally started * * *."

The question whether a "hostile" fire pre-existed the explosion or whether the explosion occurred when the electric light switch was turned on was one of fact and for the jury to determine.

The testimony of Lanasa that he saw a fire in the building before the explosion is not rebutted by anyone, nor by the circumstances. We

are not told how the fire became ignited, nor how long it had existed before Lanasa saw it. What is important is that Lanasa's testimony showed that he saw a fire after he had entered the room and looked up toward its ceiling, an appreciable time both after he had turned on the light switch, and before the explosion. There was no instantaneous or simultaneous explosion coincident with the turning on of the electric switch.

At any rate, regardless of the cause of origin, there was a fire, whether or not of short or long duration, which preceded the explosion, and it was apparently the efficient cause thereof. That it was a hostile fire cannot be doubted. It was not confined to a place intended for a fire, and it was not intentionally started.

The testimony of Lanasa that the flame which he saw was a fire was supported by Burke, who said that it was as much a fire as a fire from coal, wood, or other solid substance. It was supported by the physician who treated Lanasa, who said that the latter's injuries were caused by fire burns,—burns which penetrated the skin. The severity of the burns showed that Lanasa must have been subjected to exposure to the fire for an appreciable period of time.

The insurer relies principally upon *Pearcey* v. *St. Paul Fire Ins. Co., supra; Bilsky* v. *Sun Ins. Office etc., supra;* and *Mitchell* v. *Potomac Ins. Co.,* 183 U. S. 42, 46 L. ed. 74, 22 S. Ct. 22. We have examined these cases and found them not in point factually with the case before us.

In the *Pearcey* case, *supra,* there was not sufficient evidence of a fire in the building, nor as to the cause of the explosion, from which a jury could find that the explosion had been preceded by a hostile fire in progress on the insured premises.

In the *Bilsky* case, *supra,* there was no direct evidence of a "preceding hostile fire." There, a spark from an electric switch apparently set off instantaneously a destructive explosion within the building, and the court held that the spark was not of itself to be considered hostile.

In the *Mitchell* case, *supra,* there were two fires. There was sufficient evidence as to one of the fires to submit to the jury the question whether it preceded the explosion. As to the other fire, which enveloped the place and filled it with blue flames when a match was lit, the court held, as a matter of law, no fire preceded the explosion.

Here, the evidence and the reasonable inferences deducible therefrom were sufficient to justify the verdict of the jury in finding that

a hostile fire preceded and resulted in the explosion, and that the fire, the explosion, and the fire which followed together caused the destruction of the building.

We find no prejudicial error in the court's instructions. The insurer has had a fair and impartial trial, and the judgment of the trial court is affirmed.

*Affirmed.*